**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MIQUENEL ALTIDOR *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>TOMS RIVER POLICE DEPARTMENT *et al.*,<br><br>Defendants. | Civil Action No. 18-14834 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Defendants Toms River Police Department, Township of Toms River ("Toms River"), Sergeant Edmund Mooney ("Sergeant Mooney"), Officer Matthew Crosta ("Officer Crosta"), Officer Anthony Pacella ("Officer Pacella"), and Officer Pascel Gambardella's ("Officer Gambardella," and collectively with the others, "Defendants") Motion for Summary Judgment. (ECF No. 50.) Plaintiffs Miquenel Altidor ("Altidor") and Ashley Altidor ("Ashley") opposed (ECF No. 54), and Defendants replied.[1] (ECF No. 57.) The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants-in-part and denies-in-part Defendants' Motion.

---

[1] Counts One, Three, Five, Six, Twelve, and Thirteen pertain only to Miquenel Altidor. The remaining Counts pertain to Ashley Altidor (acting through her *guardian ad litem*), as well. A Stipulation and Order of Dismissal were entered in October 2021 as to Mitchnaidine Altidor, ending the suit as to that plaintiff. (ECF No. 45.) For the sake of simplicity, the Court will primarily refer to Miquenel Altidor throughout this Memorandum Opinion and only reference Ashley Altidor where necessary.

# I.   BACKGROUND[2]

## A.   The Events of December 28, 2017

This story begins a little before 9:00 PM on December 28, 2017, when the alarm company ADT Security Services ("ADT") received a silent panic alarm notification from a residence located at 804 Castle Drive in Toms River, New Jersey. (Defs.' Moving Br., Ex. C, ECF No. 50-6.)[3] ADT attempted to call the resident of the home, Altidor, without success. (Defs.' Statement of Undisputed Facts ¶ 9 ("DSUF"), ECF No. 50-3; Pls.' Statement of Undisputed Facts ¶ 9 ("PSUF") (Altidor noting that his home and cell phone were not working that night), ECF No. 54-1.) Because ADT remained unable to contact the homeowner, it relayed that information to the Toms River Police Department (the "Police Department"). (Defs.' Moving Br., Ex. C.)

Meanwhile, Police Department Officers Crosta and Garret Henshaw were on duty that evening. (Defs.' Ex. B, at 3; Crosta Dep. Tr. 31:6-9, ECF No. 50-7; PSUF ¶ 113.) After hearing from dispatch about the silent alarm, Officers Crosta and Henshaw arrived at Altidor's home in marked police vehicles and noticed two empty vehicles were parked in the driveway. (Defs.' Ex. B, at 5; Mooney Dep. Tr. 46:11-12, ECF No. 50-8; PSUF ¶ 113.) Officer Crosta ran the vehicles' license plates and determined that they appeared to be registered to a resident of the home—Altidor. (Crosta Dep. Tr. 33:21-34:3; PSUF ¶ 113.) So, Officer Crosta asked the Police Department dispatcher whether they could phone the resident to check on his status. (Crosta Dep. Tr. 34:20-24.)

---

[2] On a summary judgment motion, the Court will "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

[3] The Court only references facts within Defendants' Statement of Undisputed Facts that Altidor does not dispute or Defendants' exhibits that Altidor does not contest.

The Police Department dispatcher attempted to do so through several phone calls but was unsuccessful. (Crosta Dep. Tr. 34:20-24; Defs.' Ex. B, at 3; PSUF ¶ 9.)

At some point, after arriving on the scene, Office Henshaw walked around to the back of the residence to check for activity. (Crosta Dep. Tr. 44:3-6; Mooney Dep. Tr. 59:23-60:5.) Meanwhile, Officer Crosta conducted the initial surveillance of the house. (*See generally* Crosta Dep. Tr. 32-43.) First, he knocked on the door several times.[4] (*See generally* Defs.' Moving Br., Exs. D, E, F.)[5] Then, while peering in through a window near the front door, Officer Crosta observed the shoulder of a Black man in a white shirt near the foyer who moved away from the door as Officer Crosta shined his light inside. (Crosta Dep. Tr. 41:1-25, 42:1-25, 43:1-9; Mooney Dep. Tr. 55:3-15; PSUF ¶¶ 116-17.) At this point Officer Crosta proceeded to radio in for additional backup. (Crosta Dep. Tr. 43:20-22.) Shortly after, Sergeant Mooney arrived and Officer Crosta debriefed him on the situation. (Defs.' Moving Br., Ex. B, at 3.) Police Department officers including Officer Gambardella and Officer Pacella continued to arrive in police vehicles. (DSUF ¶ 16.) About six or seven minutes later, and after the officers on the scene continued to receive no response from anyone in the home, Sergeant Mooney decided to make a forced entry with the rest of the officers following closely behind. (PSUF ¶ 6; Mooney Dep. Tr. 60:9; Defs.' Moving Br., Ex. F 0:09-0:13.)

---

[4]  Because there remains a potential dispute as to whether Officer Crosta rang the doorbell, the Court ignores that fact for this Motion. (*See* Defs.' Moving Br., Ex. B, at 3. *But see* Mooney Dep. Tr. 54:9-11; Crosta Dep. Tr. 38:1-4.) The video evidence clearly portrays Office Crosta knocking on the door. (Pls.' Ex. E 0:22-24.)

[5]  Defendants' Exhibits D, E, and F are video footage captured from Altidor's home security devices that depict short segments from December 28, 2017, capturing different angles. They reflect Defendants' arrival at Altidor's home and subsequent interaction from inside the house. The videos, each less than a minute long, were made available to the Court but do not appear on the docket.

Meanwhile, Altidor was inside his bedroom sleeping when he was abruptly awoken by a loud bang. (Altidor Dep. Tr. 29:12-21; PSUF ¶ 6.) He rose, walked out of his room, and was immediately confronted by a swarm of police officers with guns drawn. (PSUF ¶ 6; Defs.' Moving Br., Ex. F 0:04; Altidor Dep. Tr. 30:1-14). Leading the way was Sergeant Mooney, followed by Officers Crosta, Gambardella, and Pacella. (Mooney Dep. Tr. 91:7-17.) Police officers began yelling to Altidor that he was "under arrest" and, without hesitation, Altidor raised his hands horizontally to signal he was not a threat. (PSUF ¶ 7; Defs.' Ex. F 0:06; Altidor Dep. Tr. 30:3-7.)[6] Sergeant Mooney initially approached and confronted Altidor by guiding him to the ground. (Defs.' Ex. F 91:18-21; Altidor Dep. Tr. 35:1-9.) Sergeant Mooney took the lead on handcuffing Altidor. (Defs.' Ex. F 0:13-0:16; Altidor Dep. Tr. 37:18-24.) Many of the officers stood back and took no part in the arrest. (*E.g.*, Gambardella Dep. Tr. 55:5-7, ECF No. 50-10.) But, as this was unfolding, Officer Pacella decided to bypass Officer Gambardella on the stairs and subsequently rush up to the second floor where Sergeant Mooney was finishing his arrest.[7] (Defs.' Ex. F 0:16-0:24; Gambardella Dep. Tr. 56:9-11.) Officer Pacella then thought best to physically grab Altidor, push him to the ground, and pin him with his knee. (Pacella Dep. Tr. 61:10-17, ECF No. 50-9; Altidor Dep. Tr. 41:5-9.) More specifically, Officer Pacella used his hand and forearm to shove Altidor to the ground and afterwards, placed his knee on Altidor's upper back. (Defs.' Ex. F 0:18-0:24; Altidor Dep. Tr. 41:5-9.)

---

[6] The Court in part relies on the unambiguous depiction of the events as captured in the video, in addition to Altidor's Undisputed Statement of Facts. (*See* Defs.' Ex. F; PSUF ¶ 7.)

[7] A dispute exists as to whether Altidor listened to the police officers' command to get on the ground. (*See* Mooney Dep. Tr. 97:19-21 ("[Altidor] did not physically resist our efforts, to my recollection."); Crosta Dep. Tr. 83:16-17 ("At this point it appeared that [Altidor] was pretty compliant."). *But see* Pacella Dep. Tr. 61:10-17 ("I observed [Mooney] struggling to [handcuff] [Altidor].").) The Court therefore construes this fact in the light most favorable to Altidor.

As this took place, the other police officers encountered Altidor's two juvenile daughters while searching the house. (Defs.' Ex. F 0:07-0:12.) Eventually, Altidor informed the officers that he owned the home and that no one was in danger. (Defs.' Varga Cert., Ex. B, at 5, ECF No. 50-5.) Thereafter, the officers proceeded downstairs and found Mr. Altidor's brother on the first floor, only then realizing that he was the man that Officer Crosta initially saw through the front door. (Crosta Dep. Tr. 54:20-25; Defs.' Varga Cert., Ex. B, at 3-4.) A heated discussion between the police and Altidor unfolded. (Mooney Dep. Tr. 76:24; Crosta Dep. Tr. 60: 4-7.) The discussion was intermittently disrupted by Altidor and the Police Department making phone calls to ADT regarding what triggered the silent alarm. (Defs.' Varga Cert., Ex. B, at 4.) The police then left. (*Id.*)

Toms River is responsible for hiring, training, and supervising members of the Police Department. Defendants attended the police academy prior to joining the force and were initially trained on the use of force while at the academy. (*See* Mooney Dep. Tr. 11:9, 18:8-24:18; Pacella Dep. Tr. 13:3-15, 16:18-24; Crosta Dep. Tr. 10:1-13, 13:4-7; Gambardella Dep. Tr. 11:6-20, 14:1-20.) In addition to the initial training, each year the Police Department officers received updated use of force training. (*See* Mooney Dep. Tr. 19:12-20:14; Pacella Dep. Tr. 26:6-18; Crosta Dep. Tr. 14:10-24; Gambardella Dep. Tr. 21:12-22:7.) The training did not include any specific training on forced entry into residential homes or responding to silent home alarms, however. (Mooney Dep. Tr. 29:1-8, 24:17-24; Pacella Dep. Tr. 32:6-25; Crosta Dep. Tr. 18:6-8; Gambardella Dep. Tr. 25:9-14.) Nonetheless, the officers were aware of the Police Department's general procedures. (Mooney Dep. Tr. 27:1-7; Pacella Dep. Tr. 28:13; Gambardella Dep. Tr.

13-22.) The Police Department directly hired Officers Crosta, Pacella, Gambardella and Sergeant Mooney.[8]

### B.    Procedural Background

Following the silent alarm debacle, Altidor sued Toms River, the Police Department, and the police officers on the scene. (*See generally* Compl., ECF No. 1.) Defendants answered the Complaint (ECF No. 10), and the parties engaged in extensive discovery that spanned over several years, including depositions of the Police Department officers, Altidor, and others. Defendants' instant Motion followed, to which Altidor opposed and Defendants replied. (ECF Nos. 50, 54, 57.)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine dispute of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the

---

[8] Prior to his hire by the Police Department, Officer Pacella was named in two lawsuits that alleged that he used excessive force while a member of the New York Police Department. (Pacella Dep. Tr. 6:1-3; 14:1-9.) The record does not indicate the resolution of either matter or the extent of Officer Pacella's liability or involvement in those suits. His prior police department disciplined him for other procedural and administrative issues, however. (*Id.* at 14:15-25.) The Toms River Police Department conducted a background investigation into Officer Pacella before deciding to hire him as a patrolman. (*Id.* at 15:10-19.)

moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine dispute as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine disputes of material fact exist). "[U]nsupported allegations in . . . pleadings are insufficient to repel summary judgment." *Schoch v. First Fid Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine [dispute] of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter but to determine whether there is a genuine dispute for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.

III.   **DISCUSSION**

This suit presents a complex fact pattern implicating several different Defendants in a variety of constitutional, statutory, and common law tort causes of action. In total, Altidor brings thirteen counts against seven named Defendants. (*See generally* Compl.)

As an initial matter, Altidor sues the Toms River Police Department as a separate entity, which he may not do. The Complaint originally brought several causes of action against the Toms River Police Department in parallel with the Township of Toms River. (*See generally* Compl.) But "[i]n New Jersey a municipal police department is not an entity separate from the municipality." *Adams v. City of Camden*, 461 F. Supp. 2d 263, 266 (D.N.J. 2006) (citing N.J. Stat. Ann. § 40A:14-118). Indeed, "[Altidor] has no objection to dismissing the Township of Toms River Police Department."[9] (Pls.' Opp. Br. 22.) As such, the Court grants summary judgment as to the Police Department.

With preliminary matters addressed, the Court next examines Altidor's remaining claims and notes that they arise from three separate sets of actions taken by Defendants. *First*, the decision to forcibly enter Altidor's home and the entry itself prompted claims against four Defendants—Sergeant Mooney and Officers Crosta, Pacella, and Gambardella—for state and federal racial discrimination claims and entry without a warrant. *Second*, for those same Defendants, their alleged use of force, physical contact, and physical restraint of Altidor prompted claims against these Defendants for false imprisonment and arrest, unreasonable and excessive force, common law assault and battery, intentional and negligent infliction of emotional distress, supervisor liability, and failure to intervene. *Finally*, as a reflection on all of Defendants' actions that day in

---

[9] Altidor raises concerns over liability coverage should the Court dismiss the Police Department. (Pls.' Opp'n Br. 22-23.) But because the law requires such dismissal, the issue of liability is of no consequence.

responding to the ADT alarm, the Complaint raises negligent training and hiring claims against Toms River and certain supervisors. For clarity purposes, the Court will address each bucket separately, noting which Defendants are implicated.

### A.      Entry into Altidor's Home

First, the Court examines Defendants' initial response to the ADT alarm, their decision to enter the home, and whether such a decision was actionable. Altidor raises two distinct causes of action that arise from this initial set of facts: racial discrimination (both state and federal) and warrantless entry. (Compl., at 9, 14, 20.) Those claims are brought against all Defendants, including Sergeant Mooney, Officer Crosta, Officer Henshaw, Officer Pacella, Officer Gambardella, and Toms River.[10] (*Id.*)

### 1.      Preliminary Considerations

As a preliminary note, Toms River must be granted summary judgment for all claims based on the police officers' entry into the home. A local government unit or supervisory officials are not liable pursuant to 42 U.S.C. § 1983 solely based on a theory of *respondeat superior*. *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, municipalities are only liable where there is a policy or custom that inflicts the relevant constitutional injury. *Niblack v. Murray*, No. 12-6910, 2013 WL 4432081, at *7 (D.N.J. Aug. 14, 2013). A municipal policy generally is a "statement, ordinance, regulation, or decision officially adopted and promulgated by" the municipality's official. *Monell*, 436 U.S. at 690. A municipal custom is one that, "[a]lthough not authorized by written law," is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691. Thus, to prove that Toms River is liable for discrimination and

---

[10] Prior to the instant motion, the parties entered a stipulation and order of dismissal with prejudice as to Officer Henshaw on all counts. (Order, ECF No. 27.)

warrantless entry, Altidor must show that there is a policy or custom of discrimination and warrantless entry. He failed to do so.

In short, there is no evidence in the record that could support a finding of a discriminatory policy or custom. Indeed, Altidor's papers opposing Defendants' Motion focus exclusively on the actions of Defendant-Officers that night and are glaringly silent as to any municipal policy or custom that resulted in purposeful discrimination. (*See generally*, Pls.' Opp'n Br. 16-18, ECF No. 54.)

The same can be said for the claim of warrantless entry. In fact, Altidor argues that the "Defendant-Officers violated established police procedures for forcible entry," seemingly conceding that if there was a warrantless entry, those officers acted in direct contravention of municipal policy. (Pls.' Opp'n Br. 14.) In any event, Altidor went through extensive discovery and fell short of identifying any offending policies or customs. *See Benjamin v. E. Orange Police Dep't*, 937 F. Supp. 2d 582, 595 (D.N.J. 2013) (finding that the city was not liable because the plaintiff failed to plead sufficient facts demonstrating the existence of a relevant policy or custom).

Likewise, Altidor failed to provide any evidence that Toms River failed to train or supervise its officers as to dealing with potential exigent circumstances. Instead, Altidor argues that because the Police Department encounters "a dozen alarm calls a day," a separate training on forced entry into the home is required. (Pls.' Opp'n Br. 20-21.) But Altidor fails to connect the dots by providing examples of other instances where the Police Department unlawfully entered a person's home in response to a security alarm such that their officers' actions could be considered "deliberate indifference" to the rights of homeowners in that township. *See Thomas v. Cumberland County*, 749 F.3d. 217, 222 (3d Cir. 2014) ("Where the policy 'concerns a failure to train or supervise municipal employees, liability . . . requires a showing that the failure amounts to

'deliberate indifference' to the rights of persons with whom those employees will come into contact.'"). Indeed, Altidor highlights that in Sergeant Mooney's fifteen years on the force, he only made a forced entry into a premise "approximately ten times," undercutting any theory that this occurrence is common and requires specific training. (PSUF ¶ 26.) In any event, as discussed below, the Court finds that Defendants had probable cause to enter Altidor's home under exigent circumstances, precluding *Monell* liability for the initial entry into the home. *Monell*, 436 U.S. at 692 (noting that the statute requires an underlying constitutional violation). Nor does Altidor provide any explanation as to how Toms River acquiesced in racial profiling or failed to train its officers against the use of racial profiling. For those reasons, no reasonable jury could conclude otherwise, and Toms River is granted summary judgment as to Counts Two (racial discrimination under § 1983), Count Seven (violation of the New Jersey Law Against Discrimination ("NJLAD")),[11] and Count Twelve (arrest without a warrant).

### 2.    Racial Discrimination

Continuing on with the time frame of Defendants' initial decision to enter Altidor's home, the Court next grapples with Altidor and Ashley's claim of racial discrimination for the remaining Defendants. They allege that Defendants violated their constitutional rights on the grounds that "because of [their] race, [D]efendants . . . improperly racially profiled, targeted, approached, assaulted and falsely arrested and detained" Altidor and Ashley. (Compl., at 9.) They also bring discrimination claims under NJLAD alleging Defendants "discriminated against [them] on [the] basis of [their] race." (*Id.* at 14.) In short, Altidor and Ashley allege that the decision to enter their

---

[11] The state law claims under the NJLAD fail for the same reason as the federal claims. Indeed, "[i]n the absence of divergent language between the NJLAD and federal discrimination laws, the Supreme Court of New Jersey has applied federal standards in NJLAD cases." *Manaco v. Am. Gen. Assur. Co.*, 359 F. 3d 296, 305 (3d Cir. 2004).

house and restrain them was motivated by the fact that the officers identified a Black male inside the house.

Under federal law, to succeed on a discrimination claim under § 1981, a plaintiff must show (1) that he belongs to a racial minority; (2) defendants had an intent to discriminate against him on the basis of race, and (3) defendants did, in fact, discriminate against him to his detriment concerning one or more of the activities enumerated in § 1981. *Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001). Similarly, to prevail on a § 1983 racial profiling claim, a plaintiff must prove that the actions of each defendant (1) had a discriminatory effect on him; and (2) were motivated by a discriminatory purpose. *Brooks v. Codispoti*, No. 12-05884, 2015 WL 9462086, at *7 (D.N.J. Dec. 28, 2015) (citing *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002)). To prove a discriminatory effect, a plaintiff must "show that [he] is a member of a protected class and that [he] was treated differently from similarly situated individuals in an unprotected class." *Bradley*, 299 F.3d at 206. "Discriminatory effect may be proven by naming similarly situated members of an unprotected class who were not selected for the same search or, in some cases, by submitting statistical evidence of bias." *Id.*

With the standard set, one thing is clear: Altidor must show, at a minimum, that at least one of Defendants' decisions on December 28, 2017, whether it be to enter his house or to use physical force against him, was motivated by a discriminatory purpose. He fails to do so. There is nothing in the record that could lead a reasonable jury to conclude that the officers of the Police Department were motivated by discriminatory racial bias. *Special Police Org. v. City of Newark*, No. 19-8444, 2019 WL 4410066, at *3 (D.N.J. Sept. 16, 2019) (dismissing § 1981 claim where plaintiffs failed to present any "facts to suggest that [they] were discriminated against based on their races or ethnicities"). The extent of Altidor's argument on the racial discrimination claim is

that the officers knew that he was Black, and that Officer Crosta saw his brother through the window and identified him as a Black male. (Pls.' Opp'n Br. 17-18.) To support this argument, Altidor's expert, Dr. Jon M. Shane, argues that Officer Crosta did not rely upon "any objectively reasonable facts" to conclude that the Black man he saw in the house was an intruder. (Shane Rep., Ex. F, at 18, ECF No. 54-9.)

The Court finds that Altidor's evidence on this count is far too speculative and therefore insufficient. First, no dispute exists that a silent alarm at the home was triggered and ADT informed law enforcement officers of the potential emergency. (PSUF ¶¶ 5, 9; DSUF ¶ 1.) Nor is there a dispute that ADT and the Police Department were unable reach Altidor by telephone. (Defs.' Moving Br., Exs. B, C.) Officers saw an individual inside the residence who backed away from the door as the officers knocked. (DSUF ¶ 14; PSUF ¶ 116.) To be sure, there is more than an objectively reasonable inference that a burglary or a hostage-in-process situation was unfolding. Altidor's evidence that Officer Crosta described the male inside the house as Black (Pls.' Opp'n Br. 16-18) is wholly insufficient to be the sole evidence of racist intent because "Officer Crosta's description of the male that he observed in the Altidor residence as being a [B]lack male was simply a description of who Officer Crosta observed." (Celeste Rep., Ex. L, at 39, ECF No. 50-12.) No reasonable jury could conclude that Defendants were motivated by racial animus on the current record. *But see Williams v. Wells Fargo Bank, N.A.*, No. 16-1003, 2016 WL 4370033, at *4 (D.N.J. Aug. 10, 2016) ("to establish a § 1981 claim, [p]laintiff must still establish that [d]efendant treated him 'differently than others outside of the protected class who were similarly situated.'" (citation omitted)). The same holds true for Ashley, as there is no evidence in the record that her race played any role in Defendants' decisions that night. Accordingly, the Court grants summary judgment for all Defendants on Count Two, the federal discrimination claims under §§1981 and 1983.

For the same reasons, the Court grants summary judgment for all Defendants on Altidor and Ashley's state law discrimination claims under the NJLAD. "New Jersey courts generally interpret the [NJ]LAD by reliance upon [the construction of] analogous federal antidiscrimination statutes." *Greenfield v. Trenton Police Dep't*, No. 16-04366, 2022 WL 2314869, at *8 (D.N.J. June 28, 2022). Indeed, courts in this district have analyzed NJLAD claims based on racial discrimination using the same standard governing Equal Protection claims. *Clark v. Bd. of Educ. of the Franklin Twp. Pub. Sch.*, No. 06-2736, 2009 WL 1586940, at *6-11 (D.N.J. June 4, 2009) (analyzing a plaintiff's § 1983 claim of Equal Protection violation and his NJLAD claims together); *Rojas v. City of New Brunswick*, No. 04-3195, 2008 WL 2355535, at *31 (D.N.J. June 4, 2008) (using Equal Protection standard to analyze NJLAD claim regarding an allegedly racially discriminatory arrest). The Court, accordingly, grants summary judgment for all Defendants on Count Seven.

### 3. Warrantless Entry

Similar to the discrimination cause of action, claims of warrantless entry (Count Twelve) concern only those Defendants that actually entered the house. Altidor claims that the officers "entered [his] home without a warrant and without probable cause, solely based on the suspicion of [Altidor's] race." (Compl., at 20.) The Court disposed of the race-based claims above and addresses only the warrantless entry claim, which the Court understands is also raised under § 1981 and NJLAD. (*See id.*)

As an initial matter, no dispute exists that the Police Department and its officers did not have a warrant to enter Altidor's home. The general rule is that "a warrantless entry into a person's house is unreasonable per se." *United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)). That said, a warrantless entry into a home may be appropriate in certain limited exceptions, where the Court finds that exigent circumstances justified

the intrusion. *Ramirez v. City of Camden*, No. 13-1502, 2015 WL 1403717, at *3 (D.N.J. Mar. 26, 2015); *Payton*, 445 U.S. at 590 (noting that the threshold of a home may not be crossed "[a]bsent exigent circumstances"). Government actors bear the burden of demonstrating that exigent circumstances justified the warrantless entry, and the burden is "heavy." *United States v. Mallory*, 765 F.3d 373, 383 (3d Cir. 2014) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)). Such exigent circumstances, under which the need for effective law enforcement overcomes the right to privacy, include, but are not limited to, "hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger of the lives of officers or others." *United States. v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) (citations omitted). The standard is an objective one and the police officers must have "reasonably . . . believe[d] that someone is in imminent danger." *Mallory*, 765 F.3d at 384 (quoting *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006)).

Under New Jersey law, the exigent circumstances exception accounts for circumstances in which police officers are carrying out their community-caretaking responsibilities but "may not have time to secure a warrant when emergent circumstances arise and an immediate search is required to preserve life or property." *State v. Vargas*, 63 A.3d 175, 188 (N.J. 2013). What's more, under the emergency-aid doctrine, a police officer can enter a home without a warrant if he or she has "an objectively reasonable basis to believe that an emergency requires that he [or she] provide immediate assistance to protect or preserve life, or to prevent serious injury" and there is a "reasonable nexus between the emergency and the area or places to be searched." *State v. Edmonds*, 47 A.3d 737, 745 (N.J. 2012) (internal quotations omitted).

As such, the question before the Court is whether there is a genuine factual dispute on whether the officers had an objectively reasonable basis to believe that an emergency required them to forcibly enter the home without a warrant. *Mallory*, 765 F.3d at 383-84. Given the

circumstances presented to Sergeant Mooney and the other officers at the scene, the Court answers in the affirmative as a matter of law. The record is clear that a panic alarm was tripped, that the homeowner could not be contacted after several attempts, and that a man was seen through the front door window but declined to respond to Officer Crosta knocking. (*See* PSUF ¶¶ 42-44, 116-17, 119, 120; Crosta Dep. Tr. 34:20-24; Defs.' Ex. B, at 3; Altidor Dep. Tr. 25:3-21.) This Court finds persuasive the weight of authority that panic alarms, when supported by additional circumstances, justify warrantless entry. *Cf. Ringel v. County of Nassau*, No. 18-1930, 2021 WL 4316715, at *8 (E.D.N.Y. Sept. 22, 2021) (holding that a silent panic alarm combined with surrounding circumstances justified warrantless entry); *United States v. Tibolt*, 72 F.3d 965, 970 (1st Cir. 1995) (holding that exigent circumstances justified warrantless entry where police were notified of security alarm, there was no response at the premises, and door was unlocked) (collecting cases); *United States v. Porter*, 288 F. Supp. 2d 716, 720 (W.D. Va. 2003) ("Police generally have been found to be justified in entering a home in response to a reported burglary or home security alarm, even absent a warrant, so long as the totality of the facts and circumstances support the likelihood that a burglary may be in progress.") (collecting cases); *Reardon v. Wroan*, 811 F.2d 1025, 1029-30 (7th Cir. 1987) (officers entitled to summary judgment on exigent circumstances because the front door was unlocked and they were responding to a burglary call). In addition to the silent alarm, Officer Crosta observed a man inside the home who did not answer the police officer's knocking and retreated further into the house. *United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007) ("[W]here police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest."). Accordingly, the facts here are sufficient, as a matter of law, to establish

probable cause for a warrantless entry. To conclude otherwise could undermine the effectiveness of panic alarms and cause police to second guess life-saving rescue measures in situations such as this one. Thus, the Court grants Defendants summary judgment as to Altidor and Ashley's direct and derivative claims based on Defendants' warrantless entry into Altidor's home, such as Count Twelve.

Having addressed the causes of action premised on the officers' initial decision to enter Altidor's home, the Court next addresses what occurred once Defendants were inside.

**B.      The Arrest and Detention of Altidor**

After entering the residence, the officers cleared the home and detained Altidor. The relevant actions include constructive force through the threat of a firearm, physical restraint of Altidor, and the use of physical force to subdue him. These actions led Altidor to allege claims for false imprisonment and arrest, excessive force, common law assault and battery, supervisory liability, and negligent (or intentional) infliction of emotional distress. (Compl., at 7-19.)

Before the Court addresses the substantive counts, Defendants take issue with what they characterize as a last-minute addition of Altidor's failure to intervene claim. (*See* Defs.' Reply Br. 2, ECF No. 57.) Indeed, according to Defendants, it was only after Altidor responded to their Motion for Summary Judgment that they realized he was attempting to bring this claim. (Defs.' Reply Br. 2.) In rebuttal, Altidor points to one line in his Complaint as part of his excessive force count (Count One) that reads as follows: "[Defendants'] negligent, careless, reckless and intentional act of conspiring to use excessive force *and/or their failure to intervene* and prevent the unlawful arrest and/or detention and use of excessive force, showed deliberate indifference for

the life and safety of [P]laintiff, Miquenel Altidor."[12] (Compl., at 8 (emphasis added).) But notably absent from the Complaint is an independent claim for failure to intervene. Nor does the Complaint provide facts to substantiate a failure to intervene claim outside of impermissible group pleading. *Pushkin v. Nussbaum*, No. 12-324, 2017 WL 1591863, at *7 (D.N.J. Apr. 28, 2017) ("[G]roup pleading is impermissible because it fails to put each [d]efendant on notice of their specific actions which render them liable to [p]laintiff.").

On careful review, therefore, the Court finds that Altidor's attempt to amend his Complaint through late stage briefing in opposition to summary judgment fails as a matter of law under Rule 8(a). While true that Altidor eventually provided the factual basis for his "failure to intervene" claim in response to summary judgment, the Court is "confined to the four corners of the [C]omplaint when evaluating its sufficiency." *Tri3 Enters. LLC v. AETNA, Inc.*, 535 F. App'x 192, 195 (3d Cir. 2013). Through that limited lens, it remains clear that a single reference alluding generally to a failure to intervene claim falls well short of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To be sure, courts in this district routinely consider excessive force and failure to intervene claims as separate causes of action. *See, e.g.*, *Koutsogiannis v. Rogalski*, No. 14-6579, 2019 WL 669803, at *8 (D.N.J. Feb. 19, 2019) (analyzing excessive force claim and failure to intervene claim separately and under different standards); *Roccisano v. Township of Franklin*, No. 11-6558, 2013 WL 3654101, at *8 (D.N.J. July 12, 2013) (same). Because Altidor did not plead a failure to intervene claim in his Complaint, Defendants were not provided sufficient notice to prepare a defense. The Court, accordingly, dismisses this theory of liability as to all Defendants.

---

[12] A substantially similar sentence appears in Count Ten, the state law equivalent to Count One. (*See* Compl., at 17 ("Defendants . . . using excessive force against them, failing to intervene to prevent the unlawful acts against them . . . .").)

With procedural issues settled, the Court pushes forward to the allegations arising from Defendants' arrest of Altidor.

### 1.      False Imprisonment and Arrest

Under New Jersey law, false arrest is defined as "the constraint of the person without legal justification." *Tucker v. N.Y. Police Dep't*, No. 08-2156, 2008 WL 4935883, at *5 (D.N.J. Nov. 18, 2008) (quoting *Ramirez v. United States*, 998 F. Supp. 425, 434 (D.N.J. 1998)). Here, there is no dispute between the parties that Altidor was detained. But he was only physically restrained by Officer Pacella and Sergeant Mooney. (Defs.' Moving Br., Ex. F.) Because the other officers played no part in the arrest or detention or constraint of Altidor, the Court need not spill much ink in granting those Defendants summary judgment as to Counts Three and Six.

For Sergeant Mooney and Officer Pacella, the inquiry turns on whether probable cause existed for the arrest. *Cluver v. Borough of Sayreville*, No. 10-3173, 2013 WL 394030, at *8 (D.N.J. Jan. 30, 2013). To determine whether a false arrest occurred, courts ask whether a reasonable officer would think there is probable cause at the time of arrest. *See Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (citing *Blaylock v. City of Phila.*, 504 F.3d 405, 411 (3d Cir. 2007)). Probable cause exists when the facts and circumstances within the arresting officer's knowledge are enough in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. *See Ciardiello v. Sexton*, 390 F. App'x 193, 199 (3d Cir. 2010) (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)). An arrest is lawful if there is probable cause for "any offense that could be charged under the circumstances," and the fact that a person is not ultimately charged with the offense supplying probable cause is irrelevant. *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005).

When examining post-hoc the decisions of the officers, the Third Circuit has held that courts must apply a "common sense approach" based on the totality of the circumstances. *Noble*

*v. City of Camden*, 112 F. Supp. 3d 208, 230 (D.N.J. 2015) (citing *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000)). Put another way, a defendant officer violates an individual's Fourth Amendment right to be free from false arrest if it was objectively unreasonable for the officer to believe that probable cause existed at the time of the arrest. *Johnson ex rel. Johnson v. City of Pleasantville*, No. 05-4258, 2007 WL 1412271, at *4 (D.N.J. May 14, 2007).

Here, sufficient probable cause existed at the time of entry to substantiate Defendants' arrest of Altidor. As noted above in regard to warrantless entry, the officers were under the impression that they were responding to a burglary, and for good reason:

- ADT informed them that a silent alarm was triggered at night from Altidor's house;

- Multiple attempts to contact Altidor via telephone failed;

- Police officers' knocking at door resulted in no response;

- Police officers observed a man retreat into the home as they knocked;

- Altidor is the first person they saw on entry into the house.

(PSUF ¶¶ 5, 7, 9, 43, 56, 116-17, 119-20; *see generally* Defs.' Ex. F.) On these facts, even in a light most favorable to Altidor, the Court finds no genuine dispute that Defendants acted reasonably in arresting Altidor. This is not a case where "no reasonable competent officer would conclude that probable cause exists"; should that have been the case, Altidor would have an opportunity to establish Defendants' liability. *Johnson v. Provenzano*, No. 12-1253, 2014 WL 7011545, at *4 (D.N.J. Dec. 11, 2014), *aff'd*, 646 F. App'x 279 (3d Cir. 2016). For the above reasons and analysis, the Court grants Officer Pacella and Sergeant Mooney summary judgment as to Counts Three and Six.

### 2.   Excessive Force

The Court moves next to what is perhaps the center of this suit: Altidor's allegations that Defendants used excessive force against him. At this juncture, the Court must determine whether Altidor's federal constitutional claim of unreasonable and excessive force survives a motion for summary judgment by Defendants, and if so whether it survives against all Defendants. (Compl., at 7-8.) The Complaint alleges constitutional violations by Sergeant Mooney and Officers Crosta, Henshaw, Pacella, and Gambardella. (*Id.*)

The use of excessive force is an unlawful seizure under the Fourth Amendment and constitutes a constitutional violation. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Couden*, 446 F.3d at 496; *Estate of Smith v. Marasco*, 430 F.3d 140, 149 (3d Cir. 2005). Claims alleging the use of excessive force in the course of an arrest "should be analyzed under the Fourth Amendment and its 'reasonableness' standard," under which a court inquires if the officer's "actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 395-97. The reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The Third Circuit also finds relevant "[whether] the physical force applied was of such an extent as to lead to injury";  the potential "that the persons subject to the police action are themselves violent or dangerous"; the "duration of the action" and force; "whether the action takes place in the context of effecting an arrest"; "the possibility that the suspect may be armed" under the circumstances; and "the number of persons with whom the police officers must contend at one time." *Estate of Smith*, 430 F.3d at 150 (quoting *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (abrogated on other grounds by *Curley v. Klem*, 499 F.3d 199, 208-211 (3d Cir. 2007)). In weighing these factors to determine the

reasonableness of a particular use of force, an officer's conduct "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" with an acknowledgment that "police officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (citations omitted) (internal quotation marks omitted).

As an initial matter, only Officer Pacella and Sergeant Mooney used physical force against Altidor. The other officers used only constructive force when they momentarily pointed their weapons at Altidor and his family members while initially searching the home. These other Defendants made no physical contact with Altidor or Ashley at any point. (Defs.' Moving Br. 32.) Nor do Altidor or Ashley provide any argument as to how Officers Crosta or Gambardella engaged in excessive force against them. (*See generally* Pls.' Opp'n Br. 4-7.) Indeed, "video evidence before the Court never shows [Crosta or Gambardella] touching [Altidor], even once, as he was being restrained." *Jacobs v. Cumberland Cnty.*, No. 16-1523, 2019 WL 2354473, at *7 (D.N.J. June 4, 2019). As such, summary judgment is granted in favor of Defendants Crosta and Gambardella on Altidor and Ashley's § 1983 and New Jersey Civil Rights Act excessive force claims.[13] *Id.*; *see also Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990) ("Only those defendants whose inactions or actions personally caused [the plaintiff's] injury may be held

---

[13] To be sure, any argument that the officers' brandishing of their weapons alone was an unreasonable use of force is unavailing. *Samoles v. Lacey Twp.*, No. 12-3066, 2014 WL 2602251, at *8 (D.N.J. June 11, 2014) ("Moreover, [d]efendants did not discharge their service weapons; rather, as is apparent from the [v]ideo, they held them in a manner that demonstrated control and that displayed only the intent to ensure that [p]laintiffs would comply with the arresting officers' commands.").

liable under § 1983."); *White v. City of Vineland*, 500 F. Supp. 3d 295, 308 (D.N.J. 2020) ("[T]he Court's analysis of [a] [NJCRA] claim is the same as its analysis of the Section 1983 claims.").

What remains are the claims against Officer Pacella and Sergeant Mooney—the two Defendants who used physical force against Altidor. Although the Court views the facts surrounding Altidor's excessive force claim in the light most favorable to him, the Court will not draw any inferences that are inconsistent with the video evidence. *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Indeed, all parties agree that the video accurately depicts the incident.

The Court examines whether the officers' actions were not objectively reasonable. *Graham*, 490 U.S. at 397; *Sharrar*, 128 F.3d at 822 (examining the dangerousness of the situation, duration of the action, and the context of the arrest, among other factors). Courts in this Circuit do not just consider "only the facts and circumstances at the precise moment that excessive force is applied" but also consider "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). The objective reasonableness of a particular use of force is evaluated "from the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citation omitted); *Graham*, 490 U.S. at 396.

It is undisputed that Sergeant Mooney was the first police officer to enter Altidor's home. (PSUF ¶ 13.) At that time, Sergeant Mooney believed an intruder may be inside the house and "[i]t was unclear if any of the residents were present and possibly in danger." (*Id.* ¶ 45). That impression was based on a triggered panic alarm and several unsuccessful attempts to contact the homeowner.

(*Id.* ¶¶ 9, 45). Moreover, Officer Crosta informed Sergeant Mooney he had seen a man inside the house and it was his impression that the man retreated away from the door when the police knocked. (*Id.* ¶¶ 42, 43, 116.) Once Sergeant Mooney entered the house, he spotted and confronted Altidor immediately. (*Id.* ¶¶ 58-60.) Sergeant Mooney moved Altidor into the living room to create space between the police officers and the hallway with closed doors. (*Id.* ¶¶ 61-62.) Sergeant Mooney took Altidor by the arm, instructed him to get on his knees, and then guided him to the ground. (*Id.* ¶¶ 67-70.) At this point, Sergeant Mooney attempted to handcuff Altidor.  (*Id.* ¶¶ 68, 70.)

It is settled law that reasonableness of the use of force is typically an issue reserved for the jury. *Rivas*, 365 F.3d at 198-99. Nonetheless, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citations omitted); *Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005). Here, on review of Altidor's factual narrative and the video evidence, the Court finds that Sergeant Mooney's act of guiding Altidor to the ground was objectively reasonable. For starters, Altidor does not really argue that this action was excessive force other than noting that the police officers should not have entered the house in the first place—an argument the Court has already rejected. (*See* Pls.' Opp'n Br. 3 ("[N]o crime was occurring necessitating the police to kick in the door and enter [Altidor's] house with their weapons drawn and pointed.").) Indeed, Altidor frequently refers to Sergeant Mooney's actions as merely "guid[ing]" him to the ground while initiating an arrest and instead focuses on the actions perpetrated solely by Officer Pacella as being the "forceful[] push[ing]" and "violent[]" elbowing and kneeing that was unreasonable. (*Id.* at 5-6.)

In addition, the relevant *Graham* factors mandate judgment in favor of Sergeant Mooney. First, the potential crime at issue was significant—burglary with a potential for a hostage situation. The police entered what may have been an active crime scene and immediately confronted a man atop the stairs. While it remains disputed if Altidor resisted, the duration of Sergeant Mooney's action in arresting Altidor was exceptionally brief. In short, even in a favorable light to Altidor, the Court finds no evidence that Sergeant Mooney acted unreasonably in guiding him to the ground and performing a relatively routine arrest. Nor does Altidor meaningfully attack how Sergeant Mooney effectuated his arrest, describing the encounter as "Sergeant Mooney push[ing] [Altidor] to the ground but it was mainly Officer Pacella" that took it over the top. (PSUF ¶ 63.) The Court grants summary judgment for Sergeant Mooney as to Counts One and Ten.

On the other hand, Officer Pacella remains the focal point of Altidor's grievances and therefore his actions require separate analysis. (*See* Pls.' Opp'n Br. 2-7.) There remain several disputed (material) facts that undermine the reasonableness of Officer Pacella's actions and warrant jury consideration. *Rivas*, 365 F.3d at 199 (noting that use of force is typically a jury question). Officer Pacella was the last officer in the Altidor residence. He came up the stairs and stopped at the hallway landing while Sergeant Mooney directed Altidor to the living room. Claiming that that Altidor was resisting arrest, Officer Pacella bypassed Officer Gambardella on the stairs, grabbed Altidor on the upper back, "pushe[d]" him to the ground, put his elbow into his back, and then shortly after used his knee to pin Altidor down. (PSUF ¶¶ 68-72.) Even several of the police officers believed Sergeant Mooney had control of the situation and there was no reason for Officer Pacella "to put his hands on [Altidor]." (*E.g., id.* ¶ 142.)  Moreover, it is disputed whether Altidor was resisting arrest in the first place. (*Id.* ¶ 77.) The Court finds it dubious that Officer Pacella needed to use that level of force, at least at the summary judgment stage. And the

reasonableness of Officer Pacella's actions remains genuinely disputed by the parties. (*Id.* ¶ 100 ("Officer Pacella admitted to putting his knee into [Altidor's] back while his hands were behind his back.").) As such, the reasonableness of Officer Pacella's force should be left to the jury and the Court therefore denies summary judgment as to Count One for Officer Pacella. In addition, to the extent Count Ten in the Complaint relies on excessive force, the Court finds that this theory is appropriate to proceed to trial as to Officer Pacella. For the remaining theories of Count Ten— pertaining to unlawful arrest and unlawful entry—the Court grants summary judgment in favor of Defendants.

### 3.    Common Law Battery and Assault

It is well established that "while police officers 'are privileged to commit a battery pursuant to a lawful arrest, . . . the privilege is negated by the use of excessive force.'" *Singh v. Droppa*, No. 20-1317, 2021 WL 130587, at *4 (D.N.J. Jan. 14, 2021) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995)) (alteration in original). The same necessarily holds true for assault.

Because Sergeant Mooney and the rest of the officers did not use excessive force as a matter of law, they must also be granted summary judgment for any claim of common law battery or assault. Alternatively, because a factual dispute remains as to Officer Pacella's use of force, it remains for the jury to decide if Officer Pacella's use of force was excessive. The Court denies summary judgment as to Count Five for Officer Pacella.

### 4.    Supervisor Liability

Altidor brings a claim of supervisor liability against Sergeant Mooney based on allegations that he had a duty to supervise and train Officers Crosta, Henshaw, Pacella, and Gambardella to avoid Altidor's "false[] arrest[], assault[], and injur[y]." (Compl., at 11.) Government officials generally may not be held liable for the unconstitutional conduct of subordinates under a theory of

*respondeat superior*. *See Iqbal*, 556 U.S. 662, 676 (2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978) (finding no vicarious liability for municipal "person" under 42 U.S.C. § 1983). Plaintiffs therefore must prove that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 663. Thus, a government official is liable only for his or her own conduct. Courts routinely reject the contention that supervisor liability can be imposed where the official had only "knowledge" or "acquiesce[ed]" in a subordinate's conduct. *Id.* at 677. "Hence, it appears that, under a supervisory theory of liability, . . . personal involvement by a defendant remains the touchstone for establishing liability for the violation of a plaintiff's constitutional right." *Moore v. Dow*, No. 11-281, 2011 WL 2182115, at *13 (D.N.J. June 2, 2001) (citing *Williams v. Lackawanna Cnty. Prison*, No. 07-1137, 2010 WL 1491132, at *5 (M.D. Pa. Apr. 13, 2010)).

As detailed above, the Court rejects Altidor's theory that Defendants violated his constitutional rights by entering his home and temporarily detaining him while they assessed the situation. Moreover, Sergeant Mooney did not engage in excessive force himself. The Court, therefore, grants summary judgment as to Count Four for Sergeant Mooney.

### 5.      Intentional and Negligent Infliction of Emotional Distress

To succeed on a claim for intentional infliction of emotional distress, a plaintiff must establish that the defendant (1) acted intentionally or recklessly; (2) engaged in conduct that was extreme and outrageous; (3) took actions that were the proximate cause of the plaintiff's emotional distress; and (4) inflicted emotional distress on the plaintiff that is so severe that no reasonable person would be able to endure it. *Gattas v. City of Jersey City*, No. 07-4242, 2010 WL 892187, at *7 (D.N.J. Mar. 5, 2010) (citing *Buckley v. Trenton Saving Fund Soc'y*, 544 A.2d 857, 863 (1988)). Altidor and Ashley bring claims for negligent and intentional infliction of emotional distress against Defendants.

As an initial matter, the Court grants summary judgment for Sergeant Mooney, Officer Crosta, and Officer Gambardella as to Count Eleven. As described above, Defendants' initial entry into the house and Sergeant Mooney's attempt to arrest Altidor are not actionable. Their conduct falls woefully short of being "extreme and outrageous," as required to prove negligent or intentional infliction of emotional distress. *Gattas*, 2010 WL 892187, at *7. Thus, as a matter of law, Altidor and Ashley's claim fails as to these Defendants.

But the same cannot be said for Officer Pacella. If a jury were to find that he used excessive force, it could also reasonably find that he acted recklessly and that his conduct was extreme and outrageous. Moreover, there is evidence in the record that Altidor suffers from Post-Traumatic Stress Disorder because of his interaction with Defendants and, specifically, Officer Pacella. At this pre-trial stage, the Court declines "to conclude that [Altidor's] pre-existing mental health problems preclude recovery for intentional infliction of emotional distress" because "[d]etermining the extent to which [Altidor's] mental illnesses and emotional distress were exacerbated by this incident is a factual question for the jury." *Honaker v. Town of Sophia*, 184 F. Supp. 3d 319, 328 (S.D.W.Va. 2016); *see also Suarez v. City of Salinas*, No. 18-6515, 2020 WL 205907, at *3 (N.D. Ca. Jan. 14, 2020) (holding that PTSD rises to the level of extreme emotional distress). Therefore, the Court denies Officer Pacella's motion for summary judgment as to the tort of intentional (or negligent) infliction of emotional distress as to Altidor. But in contrast, Ashley provided no evidence that Officer Pacella directed any of his conduct against her, let alone acted in a way that was extreme or outrageous towards her. The Court therefore grants summary judgment for all Defendants as to Ashley's Count Eleven claim.

### C.    Municipal Liability

Now that the Court has addressed the claims arising out of the entrance and physical detention of Altidor, the remaining claims address whether Toms River was negligent in training or hiring any of the Defendants.

#### 1.    Negligent Training

Altidor brings claims against Toms River contending that the entry into the home and the use of force was a function of the Police Department's negligent training. As noted above, the Court found no underlying constitutional or statutory violation from Defendants' initial entry into the home and, accordingly, there is no evidence to support a negligent training cause of action for failure to train on warrantless entry into residences. Similarly, there is no underlying constitutional violation for racial discrimination.

What remains is whether Toms River negligently trained its police officers on the use of force prior to the interaction between Officer Pacella and Altidor. To succeed on a claim of failure to train under § 1983, a plaintiff must "(1) identify the deficiency in training; (2) prove that the deficiency caused the alleged constitutional violation; and (3) prove that the failure to remedy the deficiency constituted deliberate indifference on the part of the municipality." *Lapella v. City of Atl. City*, No. 10-2454, 2012 WL 2952411, at *6 (D.N.J. July 18, 2012) (citations omitted). The "[p]laintiff must identify a specific deficiency, not simply general laxness or ineffectiveness of training." *Niblack v. Murray*, No. 12-6910, 2013 WL 4432081, at *6-7 (D.N.J. Aug. 14, 2013). There also must exist an affirmative link between the alleged inadequacies of the training and the constitutional violation at issue. *Id.*

Further, "[a] municipality's failure to train its police officers can subject it to liability, however, 'only where [it] reflects a 'deliberate' or 'conscious' choice by [the] municipality.'" *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001) (quoting *City of Canton, Ohio v.*

*Harris*, 489 U.S. 378, 379 (1989)) (alteration in original). Thus, "in order to meet the deliberate indifference standard for directly subjecting a municipality to section 1983 liability, [p]laintiff] must present scienter-like evidence of indifference on the part of a particular policymaker or policymakers." *Simmons v. City of Phila.*, 947 F.2d 1042, 1060-61 (3d Cir. 1991). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). For this reason, a plaintiff's claim is at its most "tenuous" when it "turns on [an allegation of] a failure to train." *Id.* at 61. That is, a municipality's deliberate indifference failure to train is not established by: "(1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct." *Simmons*, 947 F.2d at 1060. Rather, a plaintiff must identify specific training or policies that would prevent the harm and show that the failure to provide such training "can reasonably be attributed to a deliberate indifference . . . ." *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005) (citations omitted).

Here, the record falls short of establishing Toms River's deliberate indifference to providing use of force training. For one, all police officers on the scene were trained in use of force. (*See* PSUF ¶ 22 (Sergeant Mooney received use of force training at the Police Academy and annual training), ¶¶ 87-88 (Officer Pacella received use of force training at the Ocean County Police Academy and annually from the Police Department), ¶¶ 107-08 (Officer Crosta received use of force training and is familiar with policies), ¶ 134 (Officer Gambardella receives annual use of force training).) Thus, Altidor cannot argue that Toms River was "deliberat[ely] indifferen[t]" to ensuring the police officers were trained in use of force procedures. *Woloszyn*, 396 F.3d at 325.

30

Moreover, the Court need not dwell on Altidor's argument that Defendants needed training on responding to silent alarms at a residence. (*See* Pls.' Opp'n Br. 20 ("Sergeant Mooney never received formal training and instruction on forced entry into a residence.").) As discussed above, the Court finds that Defendants had good cause to enter the home as they reasonably believed a crime was being committed and residents of the home may be in danger. Therefore, Altidor cannot base his failure to train claim on Defendants' actions that were not improper.[14]

### 2. Negligent Hiring

Under New Jersey law, the tort of negligent hiring, supervision, and retention requires the satisfaction of two elements. First, the plaintiff must demonstrate that the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons." *Hottenstein v. City of Sea Isle City*, 977 F. Supp. 2d 353, 369 (D.N.J. 2013) (quoting *Di Cosala v. Kay*, 450 A.2d 508, 516 (N.J. 1982)). Second, the plaintiff must show that as a result of the employer's negligent hiring, the employee's "incompetence, unfitness or dangerous characteristics," were the proximate cause of the plaintiff's injuries. *Id.* What's more, "a finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that this officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 412 (1997). "The connection between the background of the particular applicant

---

[14] Altidor addresses at length his theory that Sergeant Mooney or the Police Department should have required Officer Pacella to fill out a use of force report *after* the incident. (Pls.' Opp'n Br. 18-19.) According to Altidor, this supports his failure to train and supervise claim as to these Defendants. But the Court fails to understand how Altidor can claim that Officer Pacella's failure to complete a report after the events of December 28, 2017 can serve to retroactively establish Altidor's constitutional claims arising from the incident. That is, Altidor has not alleged that he had a constitutional right to mandate Officer Pacella to complete a use of a force report. Thus, this argument holds no weight in support of Altidor's failure to train claim.

and the specific constitutional violation alleged must be strong" and the subsequent constitutional violation must be "a plainly obvious consequence of the hiring decision." *Id.* Municipal liability "for negligent hiring based on a single hiring decision requires the threat identified in an applicant's background to be basically *identical* to the harm eventually caused by the applicant." *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 426 (M.D. Pa. 2014) (collecting cases).

Here, Altidor provides a colorable claim for negligent hiring. Altidor established through discovery that Officer Pacella "admitted to two prior excessive force claims while he was employed by the [New York Police Department]" that resulted in litigation against Officer Pacella specifically. (Pls.' Opp'n Br. 22 (citing Pacella Dep. Tr. 4:10-6:18).) As to the underlying allegations in those prior excessive force claims, the record remains silent. But because Officer Pacella will proceed to trial on Altidor's excessive force claim (the same exact issue that he faced twice already while employed as a police officer in New York), the Court finds this issue should also proceed to trial. *See R.M. v. Sainato*, No. 11-1676, 2012 WL 1623860, at *6-7 (D.N.J. May 9, 2012) (denying motion to dismiss negligent hiring claim where the harm alleged in the applicant's background and the harm caused were of an identical nature). Toms River contends that it ran background checks on all police officers it hired, including Officer Pacella. This is not a case where Officer Pacella's prior alleged incidents bear no relation to the current allegations. *Cf. Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 968-69 (6th Cir. 2006) (awarding summary judgment on negligent hiring claim because "battery of a man, even if characterized as a crime of violence, does not make it plainly obvious that [defendant] would commit rape"); *Barney v. Pulsipher*, 143 F.3d 1299, 1308-09 (10th Cir. 1998) (holding that an arrest at age seventeen for possession of alcohol did have strong causal connection to sexual assault on incarcerated

individuals). Instead, Officer Pacella was involved in two lawsuits for excessive force, arguably creating a higher risk of him using excessive force before his encounter with Altidor. *Hottenstein*, 977 F. Supp. 2d at 369. Thus, this count is ripe for trial as a factual dispute regarding what Toms River knew at the time it hired Officer Pacella and consequently, whether that hiring was negligent.

### D.   Defendants' Attorney's Fees Request

As to attorney's fees requested by Defendants, the Court denies this request. Reasonable attorney's fees may be appropriate to the "prevailing party" in certain civil rights cases where the Court finds the suit was frivolous. *Fox v. Vice*, 563 U.S. 826, 836 (2011). No doubt exists that a suit proceeding to trial on some counts is far from frivolous. Moreover, the Court declines to award attorney's fees premised on any of the dismissed counts, as Defendants fail to make a colorable showing as to why attorney's fees are warranted. (*See* Defs.' Moving Br. 48-50.) Defendants merely proffer that Altidor brought frivolous claims as part of his suit. (*Id.*) But the Court disagrees that any of the counts were brought in bad faith and therefore finds awarding attorney's fees inappropriate. *Brown v. Borough of Chambersburg*, 903 F.2d 274, 277-78 (3d Cir. 1990) (finding that attorney's fees should not be granted unless plaintiff's constitutional suit was meritless).

### IV.   <u>CONCLUSION</u>

The Court finds that some of Altidor's claims raise genuine factual disputes best left for a jury where others fall short as a matter of law. The Court thus grants-in-part and denies-in-part Defendants' Motion for Summary Judgment. An Order consistent with this Memorandum Opinion will follow.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE